[Cite as *State ex rel. Emmer-Lovell v. Indus. Comm.*, 2024-Ohio-1225.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Jay C. Emmer-Lovell, :

    Relator, :

                                  No. 22AP-356

v. :

                       (REGULAR CALENDAR)

Industrial Commission of Ohio et al., :

    Respondents. :

D E C I S I O N

Rendered on March 29, 2024

**On brief:** *Plevin & Gallucci Co., L.P.A.*, *Frank L. Gallucci, III,* and *Bradley Elzeer, II*, and *Flowers & Grube, Louis E. Grube, Paul W. Flowers*, and *Melissa A. Ghrist*, for relator. **Argued:** *Louis E. Grube.*

**On brief:** *Dave Yost*, Attorney General, and *Denise A. Gary*, for respondent Industrial Commission of Ohio. **Argued:** *Denise A. Corea.*

**On brief:** *Ross, Brittain & Schonberg Co., L.P.A.*, and *Steven A. Boggins*, for respondent Group Management Services, Inc. **Argued:** *Michael J. Spisak.*

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

EDELSTEIN, J.

{¶ 1} Relator, Jay C. Emmer-Lovell, commenced this original action for a writ of mandamus to compel respondent, Industrial Commission of Ohio ("commission"), to vacate its December 25, 2021 order terminating his temporary total disability ("TTD") compensation on the motion of respondent, Group Management Services, Inc. ("GMS").

GMS moved for termination after Mr. Emmer-Lovell did not respond to its job offer, which Mr. Emmer-Lovell alleges was unsuitable and not made in good faith.

{¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 13(M) of the Tenth District Court of Appeals, we referred this matter to a court magistrate. The magistrate issued the appended decision, including findings of fact and conclusions of law, on November 14, 2023 and recommended we deny the writ. In reaching this conclusion, the magistrate found some evidence supported the commission's determination that the job offer constituted suitable employment and was made in good faith, and therefore terminating Mr. Emmer-Lovell's benefits was in accordance with law. (Nov. 14, 2023 Mag.'s Decision.) Mr. Emmer-Lovell timely filed objections to the magistrate's decision. Accordingly, we now independently review the decision to ascertain whether "the magistrate has properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d).

## I. Background

{¶ 3} Mr. Emmer-Lovell was employed as a utility worker by GMS when he was injured jumping from a work truck on April 19, 2019. (June 17, 2022 Compl. at ¶ 4.) A workers' compensation claim for TTD benefits was allowed for several conditions affecting his left knee and hip. (Mag.'s Decision at 2.) On July 26, 2021, Mr. Emmer-Lovell's treating physician, Dr. Albert Dunn, determined Mr. Emmer-Lovell was capable of sedentary desk work and could return to work as soon as the next day with appropriate restrictions in place. (Compl. at ¶ 9.) After receiving this report, GMS sent a job offer to Mr. Emmer-Lovell the following day via both a private carrier and certified mail service. (Mag.'s Decision at 2.) Delivery of the offer was made on July 28, 2021 and July 29, 2021, respectively. (*Id.*) The offer contained a description of a proposed light-duty work assignment and a warning that Mr. Emmer-Lovell would be "subject for termination" if he failed to accept the offer by August 2, 2021. (Sept. 23, 2022 Stipulation of Evidence at 62.)

{¶ 4} The proposed assignment was described by GMS as "a [f]ederal obligation (HR 307) of the company and is being provided to keep you working and in touch with your employer while you recover from your injury." (*Id.* at 61.) It required Mr. Emmer-Lovell to create an "Employee or Co-Worker Training Program" "aimed at informing and instructing [his] co-workers on this important health subject" over three stages. (*Id.*) The first stage would require Mr. Emmer-Lovell to learn the relevant material, the second stage

would require him to create program content, and the third stage would require him to formulate test questions to assess his coworkers' understanding of the prepared material. (Emphasis deleted.) (*Id.*) The offer provided details as to the first phase, but indicated further information concerning the second and third phases would come at a later date. The first phase was described as follows:

> PHASE ONE- Learning the subject: Read and study using only the provided material. Written note taking is the most effective way of learning. Any attempt to cut & paste from other sources is not acceptable and not compensable as wages. For the first 3 months copying directly from the manual is acceptable however over the following 3 months your efforts can either remain copying or you can move into note taking of your preference.
>
> During Phase One (note taking) you will be expected to submit 1 handwritten note-page per hour (285 words/page) and work your assigned number of hours each day to be paid for a full hour. You will be compensated by the hour and any short fall between the wages for this work will be made up by Workers Compensation using the standard 67% formula.
>
> During Phase One submit your written notes pages as agreed to with your supervisor or manager. Your notes will be saved and sent to our Risk Manager each week for review and comments. You will be notified the following week based on your learning of the material if the content is observed as being incoherent or away from the provided manual.

(*Id.*)

{¶ 5} On August 4, 2021, after Mr. Emmer-Lovell failed to accept this offer by the deadline, GMS filed a motion to terminate the TTD compensation due to Mr. Emmer-Lovell's alleged refusal of a suitable job offer that accommodated the desk work restriction outlined by Dr. Dunn. (Mag.'s Decision at 2.) Following a hearing, the district hearing officer ("DHO") granted the motion and terminated Mr. Emmer-Lovell's TTD compensation in an order dated September 17, 2021. (*Id.* at 4.) The DHO's order was appealed to a staff hearing officer ("SHO"), who affirmed the decision on December 25, 2021. (*Id.*) In the order, the SHO found Mr. Emmer-Lovell "refused a written offer of suitable employment within his physical restrictions" and Dr. Dunn declined to impose any

specific limitations other than restricting Mr. Emmer-Lovell to desk work. (Stipulation at 138.) The SHO further found that:

> [T]he light duty job offer consisted of the Injured Worker working from home and studying and summarizing a pandemic guideline based upon the recent passage of H. B. 307 as it applies to employees and employers. The light-duty offer outlined three phases over a 4 to 6 month period from which the Injured Worker was capable of performing at his own pace and comfort consistent with the only restriction on the MEDCO-14 of desk work only.
>
> The [SHO] finds from the transcript of the underlying hearing that the Injured Worker is a high school graduate with two years of college who would be capable of performing the work as outlined in the light-duty offer.

(*Id.* at 139.)

{¶ 6} The SHO found the offer was for suitable employment and then addressed Mr. Emmer-Lovell's argument that the offer was made in bad faith. The SHO concluded the offer was not made to harass Mr. Emmer-Lovell, it permitted him to work at his own pace from home, and it would allow him to "become familiar and assist in providing information pertinent to new federally mandated pandemic legislation which could be considered a benefit to the employer." (*Id.*) Accordingly, the SHO found the termination order was appropriate because Mr. Emmer-Lovell was precluded from receiving TTD compensation after "the refusal without minimal attempt of the good-faith job offer." (*Id.*) After Mr. Emmer-Lovell exhausted his remaining avenues for administrative relief, this mandamus action followed.

{¶ 7} As referenced above, the magistrate agreed with the commission's determination that the job offer was a good faith offer for suitable work and recommended we deny the writ. The magistrate was not persuaded by Mr. Emmer-Lovell's argument that the offer was unsuitable because it consisted of work that could only be performed by a licensed attorney, when the legal definition of suitability refers only to an employee's physical capacity to perform the job. (Mag.'s Decision at 9-10.) The magistrate further determined that the commission did not abuse its discretion by finding it was a good-faith offer, because there was some evidence that the job would not constitute the unauthorized

practice of law, it accomplished a valuable task for the company, and the short deadline did not indicate bad faith because the Administrative Code does not require sufficient time for a physician to review a job offer. (*Id*. at 12-14.)

{¶ 8} Mr. Emmer-Lovell filed six objections to the decision, which we address in turn.

## II. Law and Analysis

### A. Standard of Review

{¶ 9} To be entitled to a writ of mandamus, Mr. Emmer-Lovell must demonstrate a clear legal right to the relief sought, that the commission has a clear legal duty to provide such relief, and that there is no adequate remedy in the ordinary course of the law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141, 162-63 (1967). Mandamus may lie if the commission abused its discretion by entering an order unsupported by evidence in the record or if there is a legal basis to compel the commission to perform its duties in accordance with law. *State ex rel. Cassens Corp. v. Indus. Comm.*, ___ Ohio St.3d ___, 2024-Ohio-526, ¶ 10. If some evidence exists in the record, this court may not "second-guess the commission's evaluation of the evidence." *State ex rel. Black v. Indus. Comm.,* 137 Ohio St.3d 75, 2013-Ohio-4550, ¶ 22. However, "[a] mandatory writ may issue against the Industrial Commission if the commission has incorrectly interpreted Ohio law." *State ex rel. Gassmann v. Indus. Comm.*, 41 Ohio St.2d 64, 65 (1975).

### B. Relator's First Objection

{¶ 10} In his first objection, Mr. Emmer-Lovell argues the magistrate erred in finding as a matter of fact that "there is some confusion regarding the nature of the material that was to be provided to relator for purposes of the project outlined in the job offer." (Nov. 28, 2023 Objs. to Mag.'s Decision at 12-13, quoting Mag.'s Decision at 12.) Mr. Emmer-Lovell argues it was not ambiguous from the evidence in the record that the material GMS proposed he read and study during the first phase of the project was the statutory text of H.R. 307 and GMS waived the right to argue otherwise by failing to submit other materials into the record. (*Id.*) We disagree.

{¶ 11} The relevant evidence in the record is limited to the two-page job offer and a copy of H.R. 307 submitted by Mr. Emmer-Lovell's counsel. The offer states that the first stage of Mr. Emmer-Lovell's assignment consists of "[r]ead[ing] and study[ing] using only

the provided material" and then refers to "the provided manual." (Stipulation at 61.)  The second page of the offer states "[y]our [l]ight [d]uty project is to study the Pandemic manual." *(Id.* at 62.)  The title of H.R. 307 is the "Pandemic and All-Hazards Preparedness Reauthorization Act of 2013."[1] (*Id.* at 69.)

{¶ 12} The DHO did not expressly discuss what material Mr. Emmer-Lovell would be required to review, stating only that the offer consisted of "working from home on a pandemic instruction guideline for coworkers, federally mandated by HR 307." (*Id.* at 110.)  The SHO made a finding that the offer consisted of "studying and summarizing a pandemic guideline based upon the recent passage of H. B. [sic] 307 as it applies to employees and employers." *(Id.* at 139.)  From this, the magistrate concluded that it was unclear from the record if the first phase of the project required Mr. Emmer-Lovell to study the text of the federal statute or a manual on the subject of the statute provided by the employer.  (Mag.'s Decision at 12.)  The magistrate then noted that "[t]his manual is not a part of the record." (*Id.*)

{¶ 13} We disagree with Mr. Emmer-Lovell that the record clearly establishes the job required the repetitive review of H.R. 307 and that failure to submit any additional project materials constituted a waiver.  The magistrate concluded the multiple references throughout the record to a manual or other provided material, including "the Pandemic manual," constituted some evidence for the commission to make its finding that the assignment would require review of more than the statutory language, but noted a lack of clarity in the record about the specific materials.  It is undisputed that "the commission has substantial leeway in both interpreting and drawing inferences from the evidence before it." *State ex rel. Lawson v. Mondie Forge*, 104 Ohio St.3d 39, 2004-Ohio-6086, ¶ 34. Because no manual or other provided material was submitted into the record by the employer, we cannot definitively say what material Mr. Emmer-Lovell was expected to study.  However, that alone does not support a finding of error.

---

[1] We note the bill was enacted into law on March 13, 2013 as 42 U.S.C. 201. Because all parties maintain the use of H.R. 307 in their briefs, we will continue to refer to the law by its bill number.

{¶ 14} Because the issue was not waived and the magistrate properly determined there was some ambiguity about the materials Mr. Emmer-Lovell would be required to review, we overrule Mr. Emmer-Lovell's first objection.

### C. Relator's Second Objection

{¶ 15} Mr. Emmer-Lovell next objects to the magistrate's legal conclusion that a suitability analysis under Ohio Adm.Code 4121-3-32(A)(3) considers only whether the job may be performed under the claimant's existing medical restrictions. (Objs. to Mag.'s Decision at 17.) More specifically, Mr. Emmer-Lovell argues that limiting the scope of suitability risks allowing employers to place "ridiculous and impossible demands" on claimants, so long as they are medically capable of performing them. (Objs. to Mag.'s Decision at 19-20.) To illustrate this point, he suggests job offers requiring claimants to engage in illegal activities like identity theft or cybercrime could be considered suitable, as long as they could be accomplished while sitting at a desk. (*Id*. at 20.)

{¶ 16} Ohio Adm.Code 4121-3-32(A)(6) defines "job offer" in this context to mean a proposal, made in good faith, of suitable employment, within a reasonable proximity of the injured worker's residence. *See State ex rel. Ellis Super Valu, Inc. v. Indus. Comm*., 115 Ohio St.3d 224, 2007-Ohio-4920, ¶ 13. "Suitable employment" is defined as "work which is within the employee's physical capabilities." Ohio Adm.Code 4121-3-32(A)(3). *See also State ex rel. Ryan Alternative Staffing, Inc. v. Moss*, 166 Ohio St.3d 467, 2021-Ohio-3539, ¶ 8. A job offer must sufficiently describe the required duties to allow a determination of whether the offer "was for suitable employment within claimant's physical restrictions." *State ex rel. Professional Restaffing of Ohio, Inc. v. Indus. Comm*., 10th Dist. No. 02AP-696, 2003-Ohio-1453, ¶ 2.

{¶ 17} Although suitability is statutorily limited to work within the employee's physical capabilities, the suitability of a job offer is not, alone, dispositive. Therefore, Mr. Emmer-Lovell's above-described concerns are unwarranted. An offer that a claimant is physically capable of performing under their existing medical restrictions must still satisfy the other requirements set forth in Ohio Adm.Code 4121-3-32(A)(6)—that it be made in good faith and extend employment within a reasonable proximity of the injured worker's residence.

{¶ 18} Accordingly, Mr. Emmer-Lovell's second objection is overruled.

### D. Relator's Third Objection

{¶ 19} Mr. Emmer-Lovell's third objection concerns the magistrate's determination that GMS's job offer "did not demand for him to engage in the practice of law without a license" insofar as it bears on the suitability and good faith of the job offer. (Objs. to Mag.'s Decision at 21.) Mr. Emmer-Lovell argues the offer would require him to create a program training his coworkers on matters pertaining to H.R. 307. (*Id.* at 22.) The work would require legal research, analysis, and development of materials, which, he asserts, constitute the practice of law and go far beyond his capabilities. (*Id.* at 24-25.) It is undisputed that Mr. Emmer-Lovell is not licensed to practice law.

{¶ 20} Much of the confusion here stems from GMS's description of the job offer. As discussed, the proposed job is divided into three phases: (1) learning the material; (2) creating a formal training program on the material; and (3) developing assessments to test coworkers' understanding of the law. (Stipulation at 61-62.) The written offer devotes three paragraphs of text to describing the first phase of the offer and provides only a few words about the second and third phases ("Creating the Program" and "Formulating test questions," respectively), noting for both that "[t]his will be discussed when you are ready to begin this phase." (*Id.*)

{¶ 21} Mr. Emmer-Lovell argues this ambiguity indicates bad faith on the part of GMS. While Mr. Emmer-Lovell does not meaningfully claim that reading and learning about a statute constitutes the practice of law, he is not wrong to raise concerns that the second and third stages of the project could easily venture into that territory. It is plain from the text of the offer that the later stages of the project involve creating a training module based on H.R. 307 for the purpose of educating other employees of the company. At the bottom of the first page of the offer, GMS included a note of encouragement: "Your task is important to the company and should be viewed as such. We have the utmost confidence in you and your ability to help direct the company in an area needing greater focus as outlined by the 'All Hazards Preparedness and Response Act – HR307' signed by the President on March 13th 2013." (Stipulation at 61.) It is difficult to see how this would require anything other than Mr. Emmer-Lovell interpreting a complicated area of federal law and instructing his colleagues on its meaning.

{¶ 22} The commission was seemingly untroubled by this ambiguity. The SHO described the job offer as "studying and summarizing a pandemic guideline based on the recent passage of H. B. [sic] 307 as it applies to employees and employers." (*Id.* at 139.) There is no discussion of the second and third phases of the project in the SHO's order. The SHO "reject[ed] [Mr. Emmer-Lovell's] argument that the offer was not made in good faith and was further made to harass the Injured Worker" because the work could be completed at home, independent of coworkers, and at Mr. Emmer-Lovell's own pace. (*Id.*) This is a description of the conditions of the job, not the duties of the job or the employer's expectations for work product and results. Similarly, the DHO found GMS made a "good faith job offer of suitable employment" without providing an explanation for this finding. (*Id.* at 110.)

{¶ 23} "The existence of good faith is a factual determination that must be made by the commission in the first instance." *State ex rel. Pacheco v. Indus. Comm.*, 157 Ohio St.3d 126, 2019-Ohio-2954, ¶ 27. The Supreme Court of Ohio has not definitively said what may constitute bad faith, but has suggested various circumstances where a finding of bad faith may be appropriate. *See Ryan Alternative Staffing, Inc.*, 2021-Ohio-3539 at ¶ 19 ("The conscious crafting of a position that the employer knows the employee cannot accept is one way—but not the only way—an employer might make a job offer in bad faith."); *Ellis Super Valu, Inc.*, 2007-Ohio-4920 at ¶ 13 ("If ESV consciously crafted a job offer with work shifts that it knew Hudgel could not cover – as Hudgel alleges and ESV denies – then good faith may not exist."); *Pacheco* at ¶ 27 (finding that stationing claimant in work cafeteria to complete menial or nonexistent work raised the possibility of bad faith that must first be determined by the commission as the fact-finder).

{¶ 24} The SHO's finding of good faith was based on the conditions in which the job could be performed: at home, independent of coworkers, and at Mr. Emmer-Lovell's own pace. (*See* Stipulation at 139.) Unlike the inquiries into bad faith described by the Supreme Court, these findings go to the suitability of the offer in light of Mr. Emmer-Lovell's medical restrictions. From our review of the SHO's decision, the only findings that truly address whether the offer was made in good faith were the SHO's determination that Mr. Emmer-Lovell would be able to perform the work outlined in the offer because he completed two

years of college courses after graduating from high school and that the work would "be considered a benefit to the employer." (*Id.* at 139.)

{¶ 25} In its orders, "the commission must specifically state the evidence that it relied upon and briefly explain the reasoning for its decision." *State ex rel. Metz v. GTC, Inc.,* 142 Ohio St.3d 359, 2015-Ohio-1348, ¶ 14, citing *State ex rel. Noll v. Indus. Comm.,* 57 Ohio St.3d 203 (1991), syllabus. *See also State ex rel. Cline v. Abke Trucking, Inc.,* 137 Ohio St.3d 557, 2013-Ohio-5159, ¶ 15 ("But the commission must issue an order that contains sufficient detail of its reasoning and the evidence supporting it to indicate the grounds underlying its decision. Failure to do so constitutes an abuse of discretion."). And "[t]he commission is not required to list all the evidence that it considered in its order, but only that which it relied upon to reach its conclusion." *Metz* at ¶ 14, citing *State ex rel. Buttolph v. Gen. Motors Corp, Terex Div.,* 79 Ohio St.3d 73, 77 (1997).

{¶ 26} Hearings were conducted before both the DHO and the SHO. The SHO's assessment of Mr. Emmer-Lovell's education was pulled from "the transcript of the underlying [DHO] hearing." (Stipulation at 139.) While a transcript exists for the SHO hearing, the transcript of the hearing before the DHO is not part of the record. From the transcript of the SHO hearing, there is a limited discussion of good faith as it pertains to the employer's purpose for offering the job, but it is evident that education and the ability to perform the job were not discussed. (*Id.* at 142-177.)

{¶ 27} From this, we conclude there is no evidence in the record to support the SHO's finding that Mr. Emmer-Lovell was able to perform the work outlined in the job offer as a high school graduate with two years of college.

{¶ 28} The job offer contemplates three phases of a project based on review and interpretation of H.R. 307 and, possibly, associated materials. As discussed previously, there is significant ambiguity about what materials will form the basis for the first phase of the project, including whether it will be the standalone text of a federal statute, supplemental materials provided by GMS, or a combination of both. Even less clear is what the second and third phases of the project will entail. Broadly, they will require synthesizing the notes from phase one to create training materials and appropriate assessments. Setting aside Mr. Emmer-Lovell's contention that this will require him to engage in the unauthorized practice of law, it is evident that this project will require the ability to

interpret, synthesize, explain, and assess understanding of federal law. From this little information, the SHO extrapolated that the offer was made in good faith because Mr. Emmer-Lovell would be capable of doing such work as a high school graduate with two years of college-level education. The reasoning behind this conclusion is not explained. Without an understanding of how the final project will be used, what materials will be provided, what level of training the supervising manager has, and what will be required in the later stages of the projects, it is unreasonable that the SHO could make such a finding from one statement describing Mr. Emmer-Lovell's level of formal education. If there was other evidence that the SHO relied on to reach this conclusion, it is not discussed in the order and not included in the record.

{¶ 29} Furthermore, at the hearing before the SHO, Mr. Emmer-Lovell's counsel asserted the purpose of the project demonstrated the offer was made in bad faith. (*See* Stipulation at 151-52.) While not argued directly by the parties at this stage, we find this point particularly salient. The SHO's response to this argument was "the specific project is to create a pandemic manual and to create a co-worker training program. Now, I'm not sure if Mr. Emmer-Lovell or his counsel have opened up a newspaper over the last few years, but this is timely and relevant material they're asking him to engage in work on." (*Id.* at 161.) This is reiterated in the SHO's order, finding the offer consisted of "studying and summarizing a pandemic guideline based upon the recent passage of H. B. [sic] 307 as it applies to employees and employers." (*Id.* at 139.)

{¶ 30} A copy of H.R. 307 is in the record. From our review of the legislation, several important points stand out. The bill became law in 2013 and authorized spending on public health programs administered under the Secretary of Health and Human Services through fiscal year 2018—three years before this job offer was presented to Mr. Emmer-Lovell. (*Id.* at 70-104.) As described in the preamble, the purpose of H.R. 307 was "[t]o reauthorize certain programs under the Public Health Service Act and the Federal Food, Drug, and Cosmetic Act with respect to public health security and all-hazards preparedness and response, and for other purposes." (*Id.* at 70.) The entirety of the bill concerns the authority and duties of the Secretary of Health and Human Services and appropriations for programs under the Secretary's control through 2018. (*See id.* at 70-104.) It does not contain a mandate for private employers, nor was it passed in response to the COVID-19

pandemic. If the SHO's finding of good faith was made, in part, on the usefulness of the job assignment and its benefit to GMS (*see, e.g., id.* at 139), we find there is no evidence to support this conclusion.

{¶ 31} We sustain Mr. Emmer-Lovell's objection to the extent that the issue of good faith was not properly reviewed by the commission, and we reject the magistrate's conclusion that there was some evidence to support the SHO's findings and the SHO appropriately applied the law as it pertains to good faith.

### E.  Relator's Fourth and Fifth Objections

{¶ 32} For ease of discussion, we address Mr. Emmer-Lovell's fourth and fifth objections together.  Mr. Emmer-Lovell objects to the magistrate's application of Ohio Adm.Code 4121-3-32(A)(6) in determining whether the short timeframe for reviewing and accepting the offer was evidence of bad faith. (Objs. to Mag.'s Decision at 25.)  Mr. Emmer-Lovell submits that "a good-faith offer would have allowed him at least some reasonable time to confirm with his treating physician that the Employer's Job Offer actually complied with the light duty clearance." (*Id.* at 27.)

{¶ 33} Instead of addressing whether these facts were indicative of bad faith, the magistrate understood it as an argument that the law required an employer to provide a longer period of time to respond to the offer.  (Mag.'s Decision at 14.)  The magistrate determined this argument lacked merit because the law does not "require that a claimant's physician must review and approve a job offer." (*Id.*)  Thus, the magistrate concluded that because the law "only requires an employer to provide an employee with the written job offer 48 hours in advance of seeking to terminate TTD," the timing of the deadline did not indicate bad faith by GMS, nor an abuse of the discretion by the commission.  (*Id.*)

{¶ 34} Mr. Emmer-Lovell raised two objections to this portion of the decision.  First, that the magistrate misapplied the timing requirement of Ohio Adm.Code 4121-3-32(A)(6).  And second, contrary to the magistrate's statement of law on physician review, "a good-faith offer would have allowed him at least some reasonable time to confirm with his treating physician that the Employer's Job Offer actually complied with the light duty clearance." (Objs. to Mag.'s Decision at 27.)

{¶ 35} We do not interpret Mr. Emmer-Lovell's arguments to mean he believed the law required GMS to give him more time to respond to the offer or that he was required to

obtain approval from his treating physician first. Instead, Mr. Emmer-Lovell seems to be arguing that the short timeframe was itself evidence of bad faith because he was unable to seek clarification from his doctor before the offer expired. He does not frame this as a statutory requirement; rather, he frames it as part of the broader good-faith analysis.

{¶ 36} Because neither the commission nor the magistrate directly addressed Mr. Emmer-Lovell's argument that the response window was evidence of bad faith, we sustain Mr. Emmer-Lovell's objections to the extent described above and instruct the commission to consider this argument on remand.

{¶ 37} Notwithstanding our discussion above, we do not agree that the magistrate's application of Ohio Adm.Code 4121-3-32(A)(6) was wholly in error, as expressly claimed in Mr. Emmer-Lovell's fourth objection. The magistrate initially, and correctly, states that if a claimant refuses an oral job offer, an employer must wait 48 hours after providing a written copy of the offer before initiating termination proceedings. (Mag.'s Decision at 14.) However, we decline to adopt the magistrate's later statement of law that Ohio Adm.Code 4121-3-32(A)(6) "only requires an employer to provide an employee with a written job offer 48 hours in advance of seeking to terminate TTD" generally, in response to Mr. Emmer-Lovell's protestation of the five-day offer deadline. (*Id.*) This mandatory waiting period is invoked only after the refusal of an ***oral*** job offer. Therefore, we decline to adopt the magistrate's conclusion that, under the 48-hour timeframe prescribed by Ohio Adm.Code 4121-3-32(A)(6), five days to answer was sufficient as a matter of law.

## F. Relator's Sixth Objection

{¶ 38} In his final objection, Mr. Emmer-Lovell objects to the magistrate's ultimate determination that some evidence supported the termination of TTD compensation.

{¶ 39} An employer may assert the refusal of suitable alternate employment as a defense to the continued payment of TTD compensation. *Ellis Super Valu, Inc.*, 2007-Ohio-4920 at ¶ 6. The employer invoking the affirmative defense bears the burden of proving the defense to the commission. *State ex rel. Quarto Mining Co. v. Foreman*, 79 Ohio St.3d 78, 84 (1997). *See also State ex rel. Welsh Ents. v. Indus. Comm.*, 10th Dist. No. 19AP-127, 2020-Ohio-2801, ¶ 24. It is the commission's duty to determine, among other factors, whether the job was offered in good faith before it may issue an order terminating TTD compensation. *Pacheco*, 2019-Ohio-2954 at ¶ 27-28.

{¶ 40} GMS's light-duty work offer—to study, train, and test his coworkers on H.R. 307 and (possibly) related materials—only renders Mr. Emmer-Lovell ineligible for continued TTD compensation if the proposal was a good-faith offer for suitable employment within a reasonable proximity of his residence. There is some evidence in the record to support the commission's findings that the offer was for suitable employment (as it appears to be within his physical capabilities), and no party has challenged the reasonable proximity requirement. Thus, Mr. Emmer-Lovell's continued eligibility turns on whether the offer was made in good faith. The role of the court of appeals is not to decide in the first instance whether the job was offered in good faith. That is a factual determination for the commission. *Ryan Alternative Staffing, Inc.*, 2021-Ohio-3539 at ¶ 16. However, the commission failed to engage in a complete analysis of whether GMS's offer was made in good faith. Without such analysis, we are unable to determine whether the commission's conclusion was based on a correct application of the law to the evidence in the record. *See id.* at ¶ 19-22 (finding that a limited writ to reconsider a case under the proper standard is appropriate when the commission made a finding of good faith without explanation or analysis). We therefore sustain Mr. Emmer-Lovell's sixth and final objection.

## III. Disposition

{¶ 41} Following our independent review of the record pursuant to Civ.R. 53, we find the magistrate erred in concluding Mr. Emmer-Lovell is not entitled to the requested writ of mandamus. We sustain Mr. Emmer-Lovell's objections to the extent expressed above and overrule the remainder.

{¶ 42} Accordingly, we issue a limited writ ordering the commission to vacate its December 25, 2021 order and enter a new order that properly considers whether GMS offered the light-duty job in good faith, consistent with this decision.

*Objections sustained in part and overruled in part*;
*limited writ of mandamus granted.*

BEATTY BLUNT and BOGGS, JJ., concur.

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Jay C. Emmer-Lovell, | : | |
| Relator, | : | |
| v. | : | No. 22AP-356 |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

M A G I S T R A T E ' S   D E C I S I O N

Rendered on November 14, 2023

*Plevin & Gallucci Co., L.P.A., Frank L. Gallucci, III,* and *Bradley Elzeer, II*, and *Flowers & Grube, Louis E. Grube, Paul W. Flowers*, and *Melissa A. Ghrist*, for relator.

*Dave Yost*, Attorney General, and *Denise A. Gary*, for respondent Industrial Commission of Ohio.

*Ross, Brittain & Schonberg Co., L.P.A.*, and *Steven A. Boggins*, for respondent Group Management Services, Inc.

IN MANDAMUS

{¶ 43} Relator, Jay C. Emmer-Lovell, seeks a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its orders terminating temporary total disability ("TTD") compensation and to enter a new order paying TTD compensation from August 2, 2021 and onward.

## I. Findings of Fact

{¶ 44} 1. Relator suffered an injury on April 19, 2019 in the course of and arising out of his employment with respondent Group Management Services, Inc. ("employer") when he jumped from the back of a semi-trailer landing directly on the anterior aspect of

his left knee. At some point thereafter, relator began receiving TTD compensation. As of December 25, 2021, relator's claim was allowed for contusion left knee; left knee sprain; left hip strain; acetabular labral tear, left hip. Relator's claim was disallowed for herniated nucleus pulposus L3-L4; herniated nucleus pulposus L4-L5; herniated nucleus pulposus L5-S1; radiculopathy L4-L5; pericapsular ganglion cyst, left knee; saphenous nerve neuritis, left knee.

{¶ 45} 2. In a MEDCO-14 physician's report of work ability ("MEDCO-14") form dated July 26, 2021, Albert Dunn, D.O., relator's physician of record, indicated relator was able to return to work with the restriction of "desk work only" beginning July 27, 2021. (Stip. at 52.)

{¶ 46} 3. On July 27, 2021, the date on which Dr. Dunn had indicated relator was able to return to work with the listed restriction, the employer sent to relator a modified work job offer by private carrier service, which reflected delivery on July 28, 2021. The employer also sent the job offer by certified mail, which was delivered to relator on July 29, 2021.

{¶ 47} 4. On August 2, 2021, relator was examined by Kristi Slabe, PA-C, regarding relator's left hip pain 12 weeks after a left hip arthroscopy. Slabe stated:

> Overall he is doing ok. He has had some issues with pain in the hip and leg since surgery but his last visit he said his preoperative pain had actually resolved. It is still better but he has some discomfort that is similar to before surgery. Most of his pain is actually of the lateral hip. He has significant tenderness to palpation over the peritrochanteric space. He also has longstanding issues that he is working on with his left knee. * * * We will see him back in 6 weeks.

(Stip. at 53.)

{¶ 48} 5. On August 4, 2021, the employer filed a C-86 motion requesting the termination of relator's TTD compensation based on relator's alleged refusal of a good faith light duty job offer. The job offer was attached to the employer's motion.

{¶ 49} In the job offer, it was stated that the "ultimate objective" of the work assignment was "to create an **Employee or Co-Worker Training Program**" with approximately 12 to 18 months allocated to the completion of the task. (Emphasis sic.) (Stip. at 61.) The assignment consisted of three phases, which were described as follows:

Phase one is about learning the material – expect 4 to 6 months of reading and studying.

Phase two is about creating the program content – expect 4 to 6 months to lay out the material content.

Phase three is about formulating written tests for those reading your condensed program using multiple-choice, True-False, and Fill in the Blank formats with answer sheets – expect 4 to 6 months to complete this phase.

(Stip. at 61.) The assignment provided the following additional details on the process for the first phase:

PHASE ONE- Learning the subject: Read and study using only the provided material. Written note taking is the most effective way of learning. Any attempt to cut & paste from other sources is not acceptable and not compensable as wages. For the first 3 months copying directly from the manual is acceptable however over the following 3 months your efforts can either remain copying or you can move into note taking of your preference.

During Phase One (note taking) you will be expected to submit 1 handwritten note-page per hour (285 words/page) and work your assigned number of hours each day to be paid for a full hour. You will be compensated by the hour and any short fall between the wages for this work will be made up by Workers Compensation using the standard 67% formula.

During Phase One submit your written notes pages as agreed to with your supervisor or manager. Your notes will be saved and sent to our Risk Manager each week for review and comments. You will be notified the following week based on your learning of the material if the content is observed as being incoherent or away from the provided manual.

(Stip. at 61.) The offer stated that further discussion of the subsequent two phases would occur when relator was ready to begin that phase.

{¶ 50} The offer provided that relator would be able to "set your own study environment." (Stip. at 62.) Additionally, the job offer provided a summary as follows:

The task you now have is one that will serve the company over time in an area of little formal understanding. Your task is important to the company and should be viewed as such. We have the utmost confidence in you and in your ability to help direct the company in an area needing greater focus as outlined by the "All Hazards Preparedness and Response Act

— HR307" signed by the President on March 13th 2013. Should you feel that you are not succeeding <u>do not give up</u> for this task will give you a sense of productive work and greater confidence in your ability to deal with knowledge, which over time will make you a more productive and informed person thus a better employee wherever you work. Speak to your supervisor if you have any questions.

(Emphasis sic.) (Stip. at 61.) The job offer indicated that "[i]f you fail to respond to this job offer by 8/2/2021 or decline this light duty job offer, you may be subject for termination." (Stip. at 62.)

{¶ 51} 6. On August 10, 2021, the Bureau of Workers' Compensation ("BWC") referred the claim to the commission for determination of the employer's August 4, 2021 motion.[2]

{¶ 52} 7. In a note signed by Slabe on August 24, 2021, it was stated that relator "has been advised that he may return to work on , with restrictions. Cleared for light duty, desk work only." (Sic passim.) (Stip. at 134.)

{¶ 53} 8. On September 15, 2021, a commission district hearing officer ("DHO") conducted a hearing on the employer's August 4, 2021 motion to terminate TTD compensation. In an order mailed on September 17, 2021, the DHO granted the employer's motion and terminated TTD compensation effective August 2, 2021.

{¶ 54} 9. In a medical opinion form dated December 16, 2021, Michael Salata, M.D., agreed that relator was temporarily and totally disabled from August 24, to December 31, 2021 due to the condition of substantial aggravation of pre-existing osteoarthritis, left hip. Regarding the rationale for this finding, Dr. Salata stated: "Status post hip arthroscopy with labral repair and osteoplasty; Degenerative changes also noted at time of surgery. Due to these findings and post op recovery he was temporarily totally disabled from work other than sedentary desk work." (Stip. at 135.)

{¶ 55} 10. On December 20, 2021, a commission staff hearing officer ("SHO") conducted a hearing on appeal from the DHO's September 17, 2021 order. In an order dated December 25, 2021, the SHO affirmed the DHO's order and maintained the

---

[2] The BWC's referral letter indicated that the employer's motion was filed August 5, 2021. The motion itself was dated August 4, 2021. The commission, through both the DHO and SHO indicated the employer's motion was filed August 4, 2021.

termination of relator's TTD compensation effective August 2, 2021. Pursuant to Ohio Adm.Code 4123-3-32, the SHO found that relator refused a written offer of suitable employment within the physical restrictions provided in the July 26, 2021 MEDCO-14 completed by Dr. Dunn. The SHO noted that Dr. Dunn did not document any specific restrictions other than a limitation to light duty desk work only.

{¶ 56} With regard to the nature of the job offer, the SHO made the following findings:

> The [SHO] finds that the light duty job offer consisted of the Injured Worker working from home and studying and summarizing a pandemic guideline based upon the recent passage of H.B. 307 as it applies to employees and employers. The light-duty offer outlined three phases over a 4 to 6 month period from which the Injured Worker was capable of performing at his own pace and comfort consistent with the only restriction on the MEDCO-14 of desk work only.

(Stip. at 139.) The SHO found relator "would be capable of performing the work as outlined in the light-duty offer" as a high school graduate with two years of college-level education. (Stip. at 139.) Related to relator's medical restrictions, the SHO found that "nothing in the contemporaneous medical records to the [July 26, 2021] MEDCO-14 completed by Dr. Dunn indicating his inability to sit for any specific period of time which would have precluded him from attempting the light-duty position offered." (Stip. at 139.)

The SHO rejected arguments raised by relator's representative that the offer was not made in good faith and was further made to harass relator, finding that relator "would have been working at home independent of any coworkers and at his own pace to become familiar and assist in providing information pertinent to new federally mandated pandemic legislation which could be considered a benefit to the employer." (Stip. at 139.) Based on those findings, the SHO concluded that "the refusal without minimal attempt of the good-faith job offer precludes payment" of TTD compensation. (Stip. at 139.)

{¶ 57} 11. On December 30, 2021, relator appealed the December 25, 2021 SHO order to the commission. The commission refused relator's appeal on January 13, 2022.

{¶ 58} 12. Relator filed his complaint in this mandamus action on June 17, 2022.

## II. Discussion and Conclusions of Law

{¶ 59} Relator seeks a writ of mandamus ordering the commission to grant him TTD compensation.

## A. Requirements for Mandamus

{¶ 60} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, a relator must establish a clear legal right to the requested relief, that the commission has a clear legal duty to provide such relief, and the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Belle Tire Distribs. v. Indus. Comm.*, 154 Ohio St.3d 488, 2018-Ohio-2122; *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). Where the commission's factual determination is supported by some evidence, it has not abused its discretion and this court must uphold the decision. *State ex rel. Seibert v. Richard Cyr, Inc.*, 157 Ohio St.3d 266, 2019-Ohio-3341, ¶ 44, citing *State ex rel. Pass v. C.S.T. Extraction Co.*, 74 Ohio St.3d 373, 376 (1996).

{¶ 61} The commission is "exclusively responsible for assessing the weight and credibility of evidence." *State ex rel. George v. Indus. Comm.*, 130 Ohio St.3d 405, 2011-Ohio-6036, ¶ 11, citing *State ex rel. Burley v. Coil Packing, Inc.*, 31 Ohio St.3d 18 (1987). Where the commission's decision is supported by some evidence, the presence of contrary evidence in the record is immaterial. *State ex rel. West. v. Indus. Comm.*, 74 Ohio St.3d 354, 356 (1996), citing *Burley*. However, the commission cannot rely on a medical opinion that is equivocal or internally inconsistent. *George* at ¶ 11. *See State ex rel. Lopez v. Indus. Comm.*, 69 Ohio St.3d 445, 449 (1994).

## B. Temporary Total Disability

{¶ 62} " ' The purpose of TTD compensation is to "compensate an injured employee for the loss of earnings that he [or she] incurs while the injury heals." ' " *Ewell v. Montgomery Cty. Court of Common Pleas*, 10th Dist. No. 13AP-1078, 2014-Ohio-3047, ¶ 13, quoting *Cordial v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 05AP-473, 2006-Ohio-2533, ¶ 8, quoting *State ex rel. Baker v. Indus. Comm.*, 89 Ohio St.3d 376, 380 (2000). When a claimant is unable to work at their prior position of employment, TTD compensation is paid. *Id.* In order to be awarded TTD compensation, " 'the claimant must show not only that he or she lacks the medical capability of returning to the former position of employment but that a cause-and-effect relationship exists

between the industrial injury and an actual loss of earnings.' " *State ex rel. Ohio State Univ. v. Pratt*, 169 Ohio St.3d 527, 2022-Ohio-4111, ¶ 17, quoting *State ex rel. McCoy v. Dedicated Transport, Inc.*, 97 Ohio St.3d 25, 2002-Ohio-5305, ¶ 35. " 'In other words, it must appear that, but for the industrial injury, the claimant would be gainfully employed.' " *Id.*, quoting *McCoy* at ¶ 35. "TTD benefits are paid during the healing and treatment period until: (1) the employee returns to work; (2) the employee's treating physician states that the employee is capable of returning to the former position of employment; or (3) the temporary disability becomes permanent." *Ewell* at ¶ 13.

**{¶ 63}** R.C. 4123.56, which governs TTD compensation, provides formulas to compensate employees in situations where an employee "suffers a wage loss as a result of returning to employment other than the employee's former position of employment due to an injury or occupational disease" or where an employee "suffers a wage loss as a result of being unable to find employment consistent with the employee's disability resulting from the employee's injury or occupational disease." R.C. 4123.56(B). Entitlement to TTD compensation is established under the statute as follows:

> If an employee is unable to work or suffers a wage loss as the direct result of an impairment arising from an injury or occupational disease, the employee is entitled to receive compensation under this section, provided the employee is otherwise qualified. If an employee is not working or has suffered a wage loss as the direct result of reasons unrelated to the allowed injury or occupational disease, the employee is not eligible to receive compensation under this section. It is the intent of the general assembly to supersede any previous judicial decision that applied the doctrine of voluntary abandonment to a claim brought under this section.

R.C. 4123.56(F). The statute also contains other restrictions on qualifying for or continuing to receive an award of TTD compensation:

> [P]ayment [for TTD] shall not be made for the period when any employee has returned to work, when an employee's treating physician has made a written statement that the employee is capable of returning to the employee's former position of employment, when work within the physical capabilities of the employee is made available by the employer or another employer, or when the employee has reached the maximum medical improvement.

R.C. 4123.56(A).

{¶ 64} Ohio Adm.Code 4121-3-32 governs claims procedures for TTD. Under Ohio Adm.Code 4121-3-32(A)(6), a "job offer" is defined as "a proposal, made in good faith, of suitable employment within a reasonable proximity of the injured worker's residence." Furthermore, that section provides certain procedures to be followed by an employer seeking to terminate temporary total disability compensation on the basis of a claimant's refusal of a job offer:

> If the injured worker refuses an oral job offer and the employer intends to initiate proceedings to terminate temporary total disability compensation, the employer must give the injured worker a written job offer at least forty-eight hours prior to initiating proceedings. The written job offer shall identify the position offered and shall include a description of the duties required of the position and clearly specify the physical demands of the job. If the employer files a motion with the industrial commission to terminate payment of compensation, a copy of the written offer must accompany the employer's initial filing.

Ohio Adm.Code 4121-3-32(A)(6). In pertinent part, Ohio Adm.Code 4121-3-32(B)(2) provides that "temporary total disability compensation may be terminated after a hearing as follows: * * * (d) Upon the finding of a district hearing officer, staff hearing officer, deputy or the industrial commission that the employee has received a written job offer of suitable employment." R.C. 4123.56(A) "grants the commission no discretion to award TTD compensation if the employer makes an offer complying with R.C. 4123.56(A) and Ohio Adm.Code 4121-3-32(A)(6)." *State ex rel. Ryan Alternative Staffing, Inc. v. Moss*, 166 Ohio St.3d 467, 2021-Ohio-3539, ¶ 10.

## C. Application

{¶ 65} The employer provided relator with a job offer that it claimed was within the restrictions given by relator's physician of record. Relator asserts the commission erred in terminating his TTD compensation because the job offer was neither suitable nor made in good faith.

*1. Whether the Job Offer Constituted Suitable Employment*

{¶ 66} Relator contends the commission abused its discretion in finding the job offer was suitable for relator because only a licensed attorney would be able to perform the work involved. Under R.C. 4123.56(A), payment for TTD compensation "shall not be made" for periods "when work within the physical capabilities of the employee is made available by the employer." The Supreme Court of Ohio has stated that R.C. 4123.56(A) only expressly requires that the work be within the claimant's medical ability, but found that R.C. 4123.56 "must be read in pari materia with the Ohio Administrative Code provision that supplements it," i.e., Ohio Adm.Code 4121-3-32. *State ex rel. Ellis Super Valu, Inc. v. Indus. Comm.*, 115 Ohio St.3d 224, 2007-Ohio-4920, ¶ 13. *See State ex rel. Scott v. Indus. Comm.*, 10th Dist. No. 07AP-1041, 2008-Ohio-4104, ¶ 15 (finding that "Ohio Adm.Code 4121-3-32(B) must be read in conjunction with Ohio Adm.Code 4121-3-32(A)" such that any job offer of suitable employment must be "reduced to writing before terminating TTD compensation").

{¶ 67} Under Ohio Adm.Code 4121-3-32(A)(6), a job offer must consist of suitable employment and be made by the employer in good faith. Ohio Adm.Code 4121-3-32(A)(6). "Suitable employment" under Ohio Adm.Code 4121-3-32(A)(3) is defined as "work which is within the employee's physical capabilities." As used in Ohio Adm.Code 4121-3-32, "[t]he word 'suitable' * * * does not mean 'suitable to the employer,' " but instead "must be suitable from an objective point of view." *Scott* at ¶ 16. Once a "actual job offer is known, with its specifications and medical demands," a reviewing body is "then in a position to determine if the employer's job offer is an offer of truly suitable employment." *Id.* When reviewing a commission determination of a job offer's suitability in a mandamus action, a court must determine whether some evidence in the record supported the commission's decision. *State ex rel. Pacheco v. Indus. Comm.*, 157 Ohio St.3d 126, 2019-Ohio-2954, ¶ 11, citing *State ex rel. Perez v. Indus. Comm.*, 147 Ohio St.3d 383, 2016-Ohio-5084, ¶ 20.

{¶ 68} Relator's arguments about the suitability of the job offer are misplaced. As explained above, inquiry into the suitability of a position is limited to analysis of whether the claimant has the physical capability to perform the offered employment in light of any medical restrictions then in existence. Ohio Adm.Code 4121-3-32(A)(3). Insofar as relator's arguments extend beyond this scope, they are more appropriately addressed in

terms of whether the job offer was made in good faith and, therefore, will be addressed below along with relator's other arguments regarding good faith.

{¶ 69} With regard to suitability, the SHO found the job offer constituted "suitable employment within [relator's] physical restrictions as provided by the MEDCO-14 * * * completed by Albert Dunn, D.O. on 07/26/2021." (Stip. at 138.) Specifically, the SHO found that the job offer "consisted of [relator] working from home * * * over a 4 to 6 month period from which [relator] was capable of performing at his own pace and comfort consistent with the only restriction on the MEDCO-14 of desk work only." (Stip. at 139.) Furthermore, the SHO found "nothing in the contemporaneous medical records to the 07/26/2021 MEDCO-14 completed by Dr. Dunn indicating his inability to sit for any specific period of time which would have precluded him from attempting the light-duty position offered." (Stip. at 139.)

{¶ 70} There exists some evidence in the record to support the SHO's finding that the job offer constituted suitable employment. In the July 26, 2021 MEDCO-14, Dr. Dunn stated that relator could return to work on July 27, 2021 "with desk work only" as the listed restriction. (Stip. at 60.) The job offer provided that relator would be "[w]orking at home" and able to "set [his] own study environment" while he completed the first phase, which involved "reading and studying" in addition to "[w]ritten note taking." (Stip. at 61-62.) Thus, there exists some evidence in the record to support a finding that the job offer consisted of work within relator's physical capabilities, and, therefore, was suitable employment under Ohio Adm.Code 4121-3-32(A)(6) and R.C. 4123.56(A). As a result, relator has not demonstrated the commission abused its discretion with regard to suitability. *Pacheco,* 2019-Ohio-2954, at ¶ 11.

*2. Whether the Job Offer Was Made in Good Faith*

{¶ 71} Relator contends the job offer was made in bad faith both with regard to the timing and substance of the offer. "The existence of good faith is a factual determination that must be made by the commission in the first instance." *Pacheco* at ¶ 27. "The conscious crafting of a position that the employer knows the employee cannot accept is one way—but not the only way—an employer might make a job offer in bad faith." *Ryan,* 2021-Ohio-3539, at ¶ 19. *See Ellis,* 2007-Ohio-4920, at ¶ 13.

{¶ 72} First, with regard to substance, relator argues that "there is no legitimate purpose for which a non-lawyer can learn about a statute on behalf of a corporation like the Employer other than the unauthorized practice of law." (Relator's Brief at 19.) Relator contends that the "SHO's Order permitted Employer to abuse its power to offer alternative suitable employment, rewarded Employer's gamesmanship, and cut off benefits for an employee who would have never been permitted to actually offer the legal advice mandated by phase two." (Relator's Brief at 21-22.) Additionally, relator argues that "[c]ommunicating the requirements of a law to another is the most basic essence of the practice of law, and accepting the Job Offer and completing its assignments would have placed [relator] at significant risk of liability." (Relator's Brief at 19.) Relator cites three cases in support of this argument: *Land Title Abstract & Trust Co. v. Dworken*, 129 Ohio St. 23 (1934); *Cleveland Bar Assn. v. CompManagement, Inc.*, 111 Ohio St.3d 444, 2006-Ohio-6108; and *Ohio State Bar Assn. v. Chiofalo*, 112 Ohio St.3d 113, 2006-Ohio-6512. None of these cases support relator's conclusion that the job offer at issue in this matter involved the unauthorized practice of law.

{¶ 73} R.C. 4705.01, which governs the practice of law, provides that "[n]o person shall be permitted to practice as an attorney and counselor at law, or to commence, conduct, or defend any action or proceeding in which the person is not a party concerned, either by using or subscribing the person's own name, or the name of another person, unless the person has been admitted to the bar by order of the supreme court in compliance with its prescribed and published rules." Regarding definitions of the practice of law, the Supreme Court of Ohio has stated:

> The practice of law is not limited to the conduct of cases in courts. It embraces the preparation of pleadings and other papers incident to actions and special proceedings and the management of such actions and proceedings on behalf of clients before judges and courts, and in addition conveyancing, the preparation of legal instruments of all kinds, and in general all advice to clients and all action taken for them in matters connected with the law. An attorney-at-law is one who engages in any of these branches of the practice of law.

*Dworken* at 28, quoting *People v. Alfani*, 227 N.Y. 334 (1919), paragraph one of the syllabus. Additionally, the court has stated:

> Any definition of the practice of law inevitably includes representation before a court, as well as the preparation of pleadings and other legal documents, the management of legal actions for clients, all advice related to law, and all actions taken on behalf of clients connected with the law. * * * In regard to corporations, a layperson generally may not *represent the corporation or take any legal action on behalf of the corporation before a court or administrative agency*.

(Emphasis added.) *CompManagement* at ¶ 22. *See Chiofalo* at ¶ 9 (finding that a practitioner of chiropractic medicine exceeded limits on the representation that a nonlawyer may provide in workers' compensation cases by "arguing statutory provisions and case law, construing the text to advance his patient's case, and interpreting the weight, significance, and credibility of evidence presented"); *Union Sav. Assn. v. Home Owners Aid*, 23 Ohio St.2d 60 (1970), syllabus ("A corporation cannot maintain litigation *in propria persona*, or appear in court through an officer of the corporation or an appointed agent not admitted to the practice of law.").

{¶ 74} Initially, the magistrate notes that there is some confusion regarding the nature of the material that was to be provided to relator for purposes of the project outlined in the job offer. Relator states in his brief that the "first phase of the project involved learning the material" and "would have required either verbatim copying or note taking from a *single federal statute and no other sources* during the course of four to six months." (Emphasis added.) (Relator's Brief at 18, 20.) Relator also states that "later phases explicitly relied on [relator's] 'ability' to 'direct the company in an area needing greater focus as outlined by the "All Hazards Preparedness and Response Act – HR307" signed by the President on March 13th[,] 2013.' " (Relator's Brief at 18, quoting Stip. at 61.)

{¶ 75} The record in this mandamus action does not contain the "provided material" that is mentioned in the job offer. (Stip. at 61.) Moreover, it is unclear based on the record as to whether the material that relator was to "[r]ead and study" in the first phase of the project actually consisted of the statutory text cited by relator. (Stip. at 61.) The job offer specifically provided that it was acceptable for relator to spend the "first 3 months copying directly from the *manual*." (Emphasis added.) (Stip. at 61.) Additionally, the job offer provided that relator "will be notified the following week based on your

learning of the material if the content is observed as being incoherent or away *from the provided manual.*" (Emphasis added.) (Stip. at 61.) This manual is not a part of the record.

{¶ 76} Moreover, the job offer does not specifically require that the statute referenced by relator would itself need to be copied. The statute is referred to in two places in the job offer. The job offer provides that "[t]his project is a [f]ederal obligation (HR 307) of the company." (Stip. at 61.) Additionally, as noted by relator, the job offer provides that "[w]e have the utmost confidence in you and in your ability to help direct the company in an area needing greater focus as outlined by the 'All Hazards Preparedness and Response Act – HR307' signed by the President on March 13th[,] 2013." (Stip. at 61.) Thus, relator's premise, i.e., that the job offer entailed the practice of law because it involved learning about and communicating statutory text, is not directly supported by the evidence in the record. Because of this lack of clarity alone, relator is unable to establish a clear legal right to the requested relief on the basis that the job offer entailed the unauthorized practice of law.

{¶ 77} Nevertheless, assuming arguendo that the material in the first phase of the job offer actually involved the statutory text mentioned by relator, relator still cannot demonstrate that the job offer entailed the unauthorized practice of law. Under the terms of the job offer, relator was instructed to learn the provided material, develop training program content for coworkers, and develop competency test questions for coworkers who would train using the finished product. (Stip. at 62.) This activity does not fall into the definitions of the practice of law in the cases cited by relator. Relator was not asked to provide legal advice in a representative capacity to a person or corporation. Nor did the job offer mandate involvement in litigation, the preparation of pleadings or legal documents, or representation before a court. Thus, the job offer did not reflect the conscious crafting of a position that the employer knew relator could not accept or would not be able to legally perform. *See Ryan*, 2021-Ohio-3539, at ¶ 19. The SHO found relator "would be capable of performing the work as outlined in the light-duty offer" as a "high school graduate with two years of college" education. (Stip. at 139.) Furthermore, the SHO found the job offer was consistent with the restriction of desk work only as provided in the applicable MEDCO-14. Some evidence supports the SHO's findings.

**{¶ 78}** Second, also with regard to the substance of the offer, relator argues that "requiring an employee to engage in interminable, repetitive copying and notetaking to enable him to conduct later tasks for which he is not even licensed is abusive and humiliating." (Relator's Brief at 21.) The SHO "reject[ed] [relator's] representative's argument that the offer was not made in good faith and was further made to harass [relator]," stating that relator "would have been working at home independent of any coworkers and at his own pace to become familiar and assist in providing information pertinent to new federally mandated pandemic legislation which could be considered a benefit to the employer." (Stip. at 139.) The job offer indicated that the task provided to relator is "one that will serve the company over time in an area of little formal understanding" and that such task was "important to the company." (Stip. at 61.) Thus, some evidence supported the SHO's finding that the job offer was not made with the intent to harass relator.

**{¶ 79}** Finally, with regard to timing, relator states that the offer was "sent through two delivery services that provided a confirmation of delivery, and it incorporated a deadline for acceptance or rejection within a brief five days, which prevented physicians from reviewing it in time." (Relator's Brief at 20.) However, this framing of the issue does not accurately reflect the statutory or administrative code requirements for termination of TTD compensation.

**{¶ 80}** Under Ohio Adm.Code 4121-3-32(A)(6), "[i]f the injured worker refuses an oral job offer and the employer intends to initiate proceedings to terminate temporary total disability compensation, the employer must give the injured worker a written job offer at least forty-eight hours prior to initiating proceedings." Such written job offer must "identify the position offered and shall include a description of the duties required of the position and clearly specify the physical demands of the job." Ohio Adm.Code 4121-3-32(A)(6). If the employer files a motion seeking termination of TTD compensation, a copy of the written offer must accompany the employer's original filing. Ohio Adm.Code 4121-3-32(A)(6). Again, R.C. 4123.56(A) simply provides that TTD compensation shall not be made when "work within the physical capabilities of the employee is made available by the employer or another employer." Neither the applicable statutory nor administrative code provisions require that a claimant's physician must review and approve a job offer

to determine that it is within the claimant's physical capabilities before a claimant may accept the offer or an employer may initiate proceedings to terminate TTD compensation on the basis of a claimant's refusal of the offer. Indeed, "nothing in R.C. 4123.56(A) or Ohio Adm.Code 4121-3-32(A)(6) permits an injured worker to receive TTD compensation after refusing a good-faith offer of suitable alternative employment, even if the injured worker exercised good faith in refusing the offer." *Ryan*, 2021-Ohio-3539, at ¶ 14.

**{¶ 81}** Here, the record reflects and relator does not dispute that he received the job offer on July 28, 2021. Nearly one week later, the employer filed its motion seeking termination of TTD compensation on August 4, 2021. Relator nevertheless protests that "the period for acceptance" was "merely five days over a weekend." (Relator's Brief at 23.) However, Ohio Adm.Code 4121-3-32(A)(6) only requires an employer to provide an employee with the written job offer 48 hours in advance of seeking to terminate TTD. Relator fails to demonstrate the commission abused its discretion with regard to the timing of the job offer.

**{¶ 82}** Relator asserts the "substance and timing of the Employer's Job Offer are perfect examples of the types of behavior that Ohio law should protect employees from." (Relator's Brief at 23.) However, it is not the commission's duty to enforce what the law should be, but what the law is. In this case, the commission made a factual determination in finding the employer made the job offer in good faith. It is not this court's role to weigh or second-guess the evidence or the inferences raised therefrom. *See State ex rel. Casey v. Indus. Comm. of Ohio*, 10th Dist. No. 20AP-247, 2022-Ohio-532, ¶ 21, quoting *State ex rel. Welsh Ents., Inc. v. Indus. Comm.*, 10th Dist. No. 19AP-127, 2020-Ohio-2801, ¶ 26 (stating that "this court 'cannot second guess the commission's judgments either as to witness credibility or on the proper weight to accord particular evidence' "); *State ex rel. Columbus Distrib. Co. v. Reeves*, 10th Dist. No. 21AP-399, 2023-Ohio-898, ¶ 8, quoting *State ex rel. Cincinnati, Inc. v. Indus. Comm.*, 10th Dist. No. 04AP-241, 2005-Ohio-516, ¶ 6 (stating that "[e]ven if there is 'conflicting evidence before the commission, this court does not re-weigh the evidence in mandamus' "); *State ex rel. Lawson v. Mondie Forge*, 104 Ohio St.3d 39, 2004-Ohio-6086, ¶ 34 (stating that "the commission has substantial leeway in both interpreting and drawing inferences from the evidence before it"). The commission's determination regarding good faith was in accordance with the law

and supported by some evidence. Therefore, relator has not demonstrated the commission abused its discretion in finding the employer's job offer was made in good faith.

**D. Conclusion**

{¶ 83} Based on the foregoing, relator has not demonstrated a clear legal right to the requested relief or that the commission is under a clear legal duty to provide such relief. Accordingly, it is the decision and recommendation of the magistrate that relator's request for a writ of mandamus should be denied.

/S/ MAGISTRATE
JOSEPH E. WENGER IV

**NOTICE TO THE PARTIES**

1.      Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b). A party may file written objections to the magistrate's decision within fourteen days of the filing of the decision.